DICKINSON, Justice,
for the Court.
¶ 1. This is an appeal of an order denying a maternal grandmother’s attempt to intervene in a custody dispute involving her grandchildren, one of whom allegedly was sexually abused by her father. Because of the unusual facts and circum *272 stances presented, we find the grandmother must be allowed to intervene to protect the interests of the minor children. We also take this opportunity to clarify the duties and responsibilities of a court-appointed guardian ad litem.
BACKGROUND FACTS[1] AND PROCEEDINGS
¶ 2. The long and complex history[2] of this case began in December, 2000, when D.C. (“the mother”)[3] and D.C. (“the father”) were divorced. The court awarded the mother physical custody of the couple’s two minor children (Jane, age five, and John, age three)[4] and granted the father liberal visitation.
¶ 3. For nearly four years thereafter, neither parent sought assistance from the court regarding their children. Then, on July 13, 2004, Jane gave her mother a note which stated, “Mama, my privates hurt BAD.” The note was accompanied by a drawing which resembled an erect penis. The mother showed the note to David Grantham, Ph.D., a psychologist in Jackson, Mississippi. Dr. Grantham referred the mother and Jane to Dr. Tammy Henderson, a pediatrician in Meridian, Mississippi.
¶ 4. On July 16, 2004, Dr. Henderson met with Jane. When Dr. Henderson invited Jane to talk about the alleged abuse, Jane spontaneously stated, “If my dad came in and did this, I wouldn’t know it because I sleep so hard.” With her medical assistant present, Dr. Henderson performed a physical examination of Jane, which revealed scabbed abrasions and scars in her genital area, and other physical indications of sexual abuse, including tearing of the hymen. Dr. Henderson concluded, “There is no doubt in my mind that [Jane] has been sexually abused to the point of at least partial penetration of her vagina.”
¶ 5. Dr. Henderson referred Jane to the University of Mississippi Rape Crisis Center where the doctor’s physical findings were consistent with the injuries observed by Dr. Henderson. The doctor reported that the evidence was inconclusive as to whether a sexual assault had occurred. Nevertheless, a social worker involved in the case contacted the Lauderdale County Sheriffs Department and the Mississippi Department of Human Services (“DHS”), both of which began investigations.
¶ 6. Jane began counseling with Donna Moore at the East Mississippi Sexual Assault Crisis Center at the Wesley House Community Center. Although Jane was reluctant to discuss the alleged abuse, she did on one occasion identify her father as the person who had touched her. Moore then asked Jane if she had seen or felt him touch her, and she replied that she hadn’t because she “slept real sound.”
¶ 7. In August 2004, the mother and the children moved to Texas, where the Texas Department of Family and Protective Services (“TDFPS”) began an investigation. *273 Jane told TDFPS investigators that her father had come into her room several times and scratched her “private part” with his fingernail and touched the “fold part” of her private part. After concluding there was reason to believe that Jane had been molested by her father, TDFPS notified the father of their suspicions by letter.
¶ 8. The mother arranged for Jane to receive counseling at the Collin County Child Advocacy Center (“CCCAC”), where Jane told her counselors that her daddy
did something with his pee pee. When I said stop. And now every time I close my eyes I see his private so I am not going to sleep.... Daddy came into my room and I think he crawled over [my brother] and then he pulled by the covers, pulled my shirt up, pulled my panties down, and started touching the pink part, the floppy things on my private, his fingernail must have been what scratched my private.
¶ 9. Meanwhile back in Mississippi, the father, in an effort to enforce his visitation rights, filed a petition to modify the divorce decree, and a motion for contempt. The mother answered and filed a counterclaim requesting that visitation be held in abeyance until the sexual-abuse allegations could be fully investigated and, in the event the abuse was verified, that visitation be terminated. The trial court appointed a guardian ad litem for the children and ordered the mother to return the children to Mississippi so that the guardian ad litem could have access to them, and so the father could exercise supervised visitation, pending the abuse investigation.
¶ 10. The mother brought the children to Mississippi during spring break in March 2005. The guardian ad litem met with the children for an hour and concluded that the father could visit with the children every day during spring break from 10 a.m. until 5 p.m. under the supervision of his new wife. According to the guardian ad litem, when Jane returned to his office from one of the visits she was visibly upset and refused to discuss what had happened during the visit with her father. Jane then went home with her mother.
¶ 11. Later that same night when Jane became hysterical, the mother and her mother, S.G.(“the grandmother”), took her to the hospital. Upon being notified, the guardian ad litem went to the hospital, where he found Jane curled in a fetal position and, according to the guardian ad litem, “had obviously been doing a lot of crying.” She told the guardian ad litem that her father had touched her in her private parts. When asked by the guardian ad litem what she remembered that her father did, she said that her father “pulled up my shirt and pulled down my panties, and touched me.” The guardian ad litem directed that there would be no more visits. The mother and the children returned to Texas where they continued counseling with the CCCAC. The counsel- or with the CCCAC informed the guardian ad litem that “the advocacy center had successfully performed a forensic interview on both children wherein both had clearly identified the sexual abuse of [Jane] and named the father as the perpetrator.”
¶ 12. On June 6, 2005, the father filed a motion in the Mississippi trial court, seeking visitation with the children. On July 7, 2005, without a hearing, the Mississippi trial court entered an. order allowing the father a week of visitation with the children to be supervised by his new wife or his mother. The visitation was to begin July 16. The mother refused to comply with the order and, instead, filed for a protective order in Collin County, Texas.
*274 ¶ 13. On August 15, 2005, the guardian ad litem issued a preliminary report expressing numerous personal opinions [5] concerning the evaluations and psychological treatment provided by the healthcare professionals who had treated Jane. For instance, in response to CCCAC counselor Renee Matthews’s statement that forensic interviews were conducted later rather than earlier because any mention of the father’s name propelled Jane into a panic attack, the guardian ad litem opined:
In the opinion of [the] guardian ad litem, this forensic interview was conducted not in search of spontaneous revelations of the child, but to confirm a previously-determined theory that sexual abuse had occurred and the Father ... was the perpetrator. A forensic interview such as this serves the purpose but in this instance, not that which was intended. The information forthcoming from this child is at a minimum transferred from someone else, whether mother, grandmother, counselor, therapist, friend, or combination thereof, and is at the other extreme the result of coaching or even brainwashing. Your guardian ad litem is convinced that this child is traumatized, but it does not appear to be the result of sexual abuse by the Father. It appears to be the result of an attempt to paint the Father of this child as a child molester for reasons known only to the accusers.
¶ 14. Glaringly absent from the guardian ad litem’s report is any discussion, evaluation or investigation of either the considerable physical evidence that Jane actually had been sexually abused (if not by her father, then by someone), or the identity of the perpetrator. Instead, the guardian ad litem’s interim report concentrated almost exclusively on whether, in his opinion, Jane had been “brainwashed” by her mother and/or her maternal grandmother, who is the appellant in the present matter.
¶ 15. On August 17, 2005 — after receiving the guardian ad litem’s preliminary report — the Mississippi trial court (again, without holding a hearing) issued a sua sponte order which severely criticized the mother for her failure to comply with the court’s orders and her failure to cooperate with the guardian ad litem. According to the order, the chancellor held a “conference in chambers.” However, the record includes no indication of any such conference, or that a court reporter was present or that the chancellor took any evidence. We pause here to state that such procedures are wholly inappropriate and inconsistent with a chancellor’s duty to issue orders and judgments based solely upon the facts included within the record.[6]
*275 ¶ 16. The order removed custody from the mother and placed the children in the custody of the Department of Human Services (“DHS”). The order granted supervised visitation to both the mother and father and further provided that visitation would be at the discretion of DHS and the guardian ad litem. Additionally, the trial court ordered a psychological evaluation of the children. Concerned that the trial court was not properly considering the evidence of abuse, the grandmother filed a motion to intervene. For reasons the trial court did not explain, the motion was denied on August 22, 2005.
¶ 17. On September 13, 2005, John Jolly, Ph.D., conducted the psychological evaluation previously ordered by the trial court. Dr. Jolly administered numerous psychological tests, and he personally interviewed Jane, who told him that her father had sexually abused her. When Dr. Jolly followed up by asking her how she generally felt about her dad, she replied, “I still love him and still want to see him during the day ... not during the night.” In addressing the question of whether Jane had been brainwashed or manipulated into making false allegations against her father of sexual abuse, Dr. Jolly stated that he was
unaware of any manipulation by either her mother or father that may have influenced [Jane’s] report ... However, in general she is presenting to the examiner in a manner which appears valid to this examiner, and the combination of symptoms and her report are quite consistent.
¶ 18. Although trial was set for September 20, 2005, it was continued because the guardian ad litem was not prepared to go forward. Instead, the guardian ad litem determined that the children should begin counseling with Dr. Jan Boggs in Meridian, Mississippi. After counseling with the children, Dr. Boggs recommended that custody be returned to the mother in order to better evaluate the children and their relationships with their parents.
¶ 19. The guardian ad litem issued an interim report in which he discussed conversations with Jane wherein he asked Jane if she understood the reasons she had been placed in the custody of DHS. She stated “that her daddy had come in her room at night.” When the guardian ad litem asked Jane if she had any problem visiting with her father, she replied, “it would be ‘ok’ except not at night.” When asked “what, if anything, she would like to ask him about the alleged abuse, if she could be alone with him, [Jane] said she would ask him to apologize, and that if he did, then all would be well.” The guardian ad litem’s interim report also addressed Dr. Jolly’s evaluation in several respects, but neglected any mention of, or reference to, Dr. Jolly’s conclusion that he was “unaware of any manipulation by either her mother or father that may have influenced [Jane’s] report.”
¶20. The trial court ordered a status conference on December 5, 2005, at which the chancellor stated:
The court has received the interim report of the guardian ad litem. I have not thoroughly reviewed the report but skipped to the back of the report and seen that there is a guardian ad litem recommendation that custody of the children remain with the DHS but placed back with the mother.
At the conclusion of the hearing, the chancellor returned the children to the mother.
*276 ¶ 21. Although the transcript of the December 5 hearing is void of any discussion of what, if any, visitation the father would have with Jane, the court issued an order granting the father unsupervised visitation with Jane. The mother refused to comply with the order and absconded from,the jurisdiction with the children. She did not return for the trial.
¶ 22. When the mother failed to appear at trial, the chancellor granted the father’s motion to strike the mother’s pleadings, including the allegations of abuse. The chancellor issued a bench opinion and judgment holding the mother in contempt of court, both civilly and criminally, and awarding custody of the children to the father. The court further ordered that the mother be incarcerated until she produced the children, and for an additional thirty days thereafter. In awarding custody to the father, the court ruled that the mother could apply to the court for access to the children after her incarceration.
¶ 23. Following the entry of final judgment from the trial court, the grandmother filed a notice of appeal to this Court, seeking reversal of the chancellor’s denial of her motion to intervene. The father filed a motion to strike the notice of appeal, claiming inter alia that her notice of appeal was filed untimely. In an unpublished order, this Court remanded the matter to the trial court for consideration of whether the notice was filed timely. Chandler v. Chandler, 2007 Miss. Lexis 139 (2007). Upon remand, the trial court[7] held that the grandmother’s motion to intervene was not timely filed. The matter before us today is the grandmother’s appeal of that decision, and the decision of the previous chancellor to deny her intervention.
¶ 24. Meanwhile, the mother (who remained absent from the jurisdiction) appealed (through her counsel) the custody order. This Court handed down an opinion (and later a substitute opinion) applying the clean-hands doctrine and fugitive-dismissal rule to dismiss the mother’s appeal. We held that “it would not serve the best interest of the children if we were to allow the mother who has demonstrated a recurring disregard for the orders of the [Chancery Court], to proceed with her appeal.” D.C v. D.C., 988 So.2d 359, 363-64 (Miss.2008).[8] A rehearing on the substitute opinion was denied. Id.
¶ 25. In her appeal, the grandmother claims that her motion for intervention was filed timely. She also argues she should have been allowed to intervene to fully develop the record with respect to the allegations of sexual abuse, and the chancellor erred in granting custody to the father without hearing the evidence of abuse.
ANALYSIS
¶ 26. The grandmother presents three issues for our consideration, which we restate for clarity:
1. Whether her notice of appeal was timely filed.
2. Whether the chancellor erred in denying the motion for intervention.
3. Whether this case should be remanded so that the trial court can conduct an evidentiary hearing on the underlying allegations of sexual abuse.
*277 ¶ 27. In her statement regarding oral argument, the grandmother suggests four issues as paramount for our consideration:
1. The procedural requirements for movants-in-intervention to appeal the denial of their motion;
2. The rights of grandparents to intervene in pending custody litigation;
3. The duties of independence of guardians ad litem where abuse is alleged; and
4. The right of a child or her grandparent to an evidentiary hearing before being forced to endure unsupervised visitation with a parent the child has accused of abusing her.
I. Whether the Grandmother’s Notice of Appeal was Timely Piled.
¶ 28. The question we must address initially is whether the grandmother’s notice of appeal was timely filed. There is great conflict in the law as to when the time begins to run for filing a notice of appeal of a denial of intervention, and this Court has not previously addressed the issue.
¶ 29. On August 22, 2005, the trial court issued an order overruling the grandmother’s motion to intervene. At the hearing on the motion, the trial court said:
The guardian ad litem has presented a report to this Court that gives me very serious concerns about the atmosphere in the mother’s home, the influence of the grandmother, and I want those children out of that atmosphere. I don’t see that you have presented anything that gives the grandmother standing to intervene, so that request is denied.
¶ 30. Six months later, on February 10, 2006, the trial judge issued both a bench opinion and a judgment. Sixteen days thereafter, the grandmother filed a notice of appeal. When the father objected to the grandmother’s appeal as having been
filed untimely, we remanded for the trial court to address the issue. Chandler, 2006 Miss. LEXIS 139.' The trial court determined that the notice of appeal was not timely filed.
¶ 31. Rule 24 of the Mississippi Rules of Civil Procedure — which sets out the procedure for intervention as a matter of right — states, in applicable parts:
(a) Intervention of Right. Upon timely application, anyone shall be permitted to intervene in an action:
[[Image here]]
(2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant’s interest is adequately represented by existing parties.
M.R.C.P. 24(a).
¶ 32. Mississippi Rules of Appellate Procedure 3(a) and 4(a) — which provide the procedure for appealing to this Court — state:
In all cases, both civil and criminal, in which an appeal is permitted by law as of right to the Supreme Court, there shall be one procedure for perfecting such appeal. That procedure is prescribed in these rules. All statutes, other sets of rules, decisions or orders in conflict with these rules shall be of no further force or effect. An appeal permitted by law as of right from a trial court to the Supreme Court shall be taken by filing a notice of appeal with the clerk of the trial court within the time allowed by Rule 4. Failure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the perfection of the appeal, *278 but is ground only for such action as the Supreme Court deems appropriate, which may include dismissal of the appeal. Interlocutory appeals by permission shall be taken in the manner prescribed by Rule 5.
M.R.A.P. 3(a).
[T]he notice of appeal required by Rule 3 shall be filed with the clerk of the trial court within 30 days after the date of entry of the judgment or order appealed from....
M.R.A.P. 4(a).
¶ 33. The trial court held that the notice of appeal was not timely filed, using interpretations of the Federal Rules of Civil Procedure in its reasoning. This Court has consistently stated that the “[ejntry of an order in one of our trial courts denying an application for leave to intervene under Rule 24 is sufficiently a final order that review of the same lies within our appellate jurisdiction.” Guaranty Nat’l Ins. Co. v. Pittman, 501 So.2d 377, 380 (Miss.1987) (citing Stallworth v. Monsanto, 558 F.2d 257, 263 (5th Cir. 1977)). See also Smith v. Holmes, 921 So.2d 283, 285 (Miss.2005); Cohen v. Cohen, 748 So.2d 91, 93 (Miss.1999). Our precedent has not heretofore, however, required an immediate appeal.
¶ 34. Furthermore, the father did not file a brief in this current appeal. Rule 31(d) of the Mississippi Rules of Appellate Procedure govern the consequences for a party’s failure to file a brief, and allows for an appellee’s brief to be stricken from the record upon motion by appellant if untimely filed, and does not allow appellee to be heard at oral argument except by permission by the Court. Further, this Court has consistently held that “although unsaid in 31(d), the rule has been stated in numerous cases that the failure of the appel-lee to file a brief is tantamount to a confession of error and will be accepted as such unless we can with confidence say, after considering the record and brief of [Appellant, that there was no error.” Snow Lake Shores Property Owners Corp. v. Smith, 610 So.2d 357, 360-61 (Miss.1992) (quoting Burt v. Duckworth, 206 So.2d 850, 853 (Miss.1968)). See also Queen v. Queen, 551 So.2d 197, 199 (Miss.1989); Sparkman v. Sparkman, 441 So.2d 1361, 1362 (Miss.1983); State v. Maples, 402 So.2d 350, 353 (Miss.1981).
¶ 35. Our case law allows, but does not require, an immediate appeal from a denial of a motion to intervene. The only party arguing before us claims that the appeal at issue was timely filed. Therefore, because of the unusual circumstances in this matter, we hold that the grandmother’s notice of appeal was timely filed on February 26, 2006.
II. Whether the Chancellor Erred in Denying the Grandmother the Right to Intervene.
¶ 36. The grandmother correctly asserts that this Court has adopted a test (referred to as the Ferguson test) to determine whether a motion for intervention should be granted. The test’s four factors are:
1) The would-be intervenor must make a timely application;
2) He [or she] must have an interest in the subject matter of the action;
3) He [or she] must be so situated that disposition of the action may “as a practical matter” impair or impede his ability to protect his interest; and
4) His [or her] interests must not already be adequately represented by the existing parties.
Perry County v. Ferguson, 618 So.2d 1270, 1271 (Miss.1993).
¶ 37. This Court has acknowledged that the trial court has “considera *279 ble discretion” when determining intervention pursuant to Rule 24(a)(2). The standard of review on appeal is abuse of discretion. Id. at 1271-72. However, both the trial court and this Court must be ever mindful of the longstanding rule in child-custody litigation, that the paramount consideration is the best interest of the child. Foster v. Alston, 7 Miss. 406, 6 Howard 406, 1842 Miss. LEXIS 58, **57-58 (1842). See also D.C. v. D.C., 988 So.2d 359, 363 (Miss.2008); Albright v. Albright, 437 So.2d 1003, 1004 (Miss.1983). We hold that the trial judge abused her discretion in not allowing the grandmother to intervene.
¶ 38. The first prong of the Ferguson test is satisfied, as there is no claim that the grandmother’s motion was not timely filed. As for the second prong, we are persuaded that — although grandparents in Mississippi have a naturally strong interest in the safety and well-being of their grandchildren — that factor, standing alone, will not suffice to allow intervention in child-custody battles between parents. However, where (as here) the safety and well-being of children are not being adequately protected by the parties to the litigation, this Court has never refused to allow participation by third parties[9] to protect those interests. To hold otherwise would, in our view, be irresponsible and contrary to the polestar consideration in such cases of the best interests of the children.
¶ 39. We find it rather obvious that the safety and well-being of the grandmother’s grandchildren would be affected by the disposition of this custody dispute, particularly with the unresolved allegations of abuse. Her interests were further affected at the time she filed her motion because the court had just placed the children in the custody of DHS, with no provision for visitation by the grandparents.[10]
¶ 40. Finally, we find that the grandmother’s interests in the safety and well-being of her grandchildren were not being represented by the existing parties. The father, who is alleged to have abused Jane, has an obvious reluctance to present evidence which would tend to confirm the allegations. The mother absconded from the jurisdiction of the court, causing the chancellor to strike her pleadings. Thus, she was in no position to protect the interests of the children by presenting the evidence of abuse. The guardian ad litem failed to provide the trial court with an objective record of all the evidence, presenting instead only the evidence which tended to confirm his opinion. And last, but not least, the chancellor issued sanctions against the mother by inappropriately striking her pleadings, including the abuse allegations. This deprived the children, and particularly Jane, of the court’s protection. We hold today that it is never appropriate to deprive children of due process safeguards by punishing one of the litigants in a custody battle and refusing to consider allegations of abuse of the children.
¶41. We hold that the trial court abused its discretion in denying the grandmother’s motion to intervene. Accordingly, the trial court’s judgment rendered *280 February 10, 2006 is set aside, and this ease is remanded to the trial court for proceedings consistent with this opinion. Upon retrial of the custody matter, the chancellor should carefully separate the remedies available for the parties’ misconduct from adjudication of the allegations of abuse.
III. The Role of the Guardian Ad Li-tem
¶ 42. In Mississippi, chancellors often appoint guardians ad litem in cases involving children who have not reached the age of majority. While it is required that guardians ad litem should be appointed in cases involving allegations of child abuse, it is also true that appointments are made in numerous other circumstances, such as contested custody actions. The role to be played by a guardian ad litem is complex and not subject to a simple, universal definition.
¶ 43. Some circumstances require that a guardian ad litem serve as an arm of the court, appointed to investigate and present to the court all necessary and material information which might affect the court’s decision. S.N.C. v. J.R.D., 755 So.2d 1077, 1082 (Miss.2000). Other circumstances might require the guardian ad litem to serve as the ward’s lawyer, with all the duties, responsibilities, and privileges required by the attorney-client relationship. This Court has held that in some instances guardians ad litem have the “same obligation of diligence as fiduciaries generally,” and can “make no admission to the injury of the minor.” In re Estate of Prine, 208 So.2d 187, 192 (Miss.1968).
¶ 44. A guardian ad litem is defined “a guardian, usually a lawyer, appointed by the court to appear in a lawsuit on behalf of an incompetent or minor party.” Black’s Law Dictionary 586 (8th ed.2005). The definition provides little guidance.
¶ 45. Interpretations and opinions vary regarding the role of a guardian ad litem. For instance, Professor Deborah H. Bell opines, “A guardian ad litem assists a court by investigating and making recommendations regarding a child’s best interest. The guardian is not an adversary and does not represent the child as a traditional advocate.” Bell on Mississippi Family Law § 5:10, at 136 (2005).
¶ 46. Even the legal encyclopedias are not completely in sync on the subject. One lists the role of the guardian ad litem as a “hybrid” role, saying,
a guardian ad litem is, in a sense, an officer of the court who is not simply counsel to one party in the litigation, but instead plays a hybrid role, advising one or more parties as well as the court, [and] the guardian is more than a nominal representative appointed to counsel and consult with the trial court, and he or she has all the duties, powers, and responsibilities of counsel who represents a party to litigation.
43 C.J.S. Infants § 321, at 459, and § 334, at 477 (2004). However, another states, “a minor’s guardian ad litem owes no duty to act as the minor’s attorney,” but says, “a guardian ad litem appointed to represent an infant defendant is regarded as an officer or agent of the court, or as a fiduciary.” 42 Am.Jur.2d Infants § 183, at 143 (2000).
¶ 47. In Mississippi jurisprudence, the role of a guardian ad litem historically has not been limited to a particular set of responsibilities. In some cases, a guardian ad litem is appointed as counsel for minor children or incompetents, in which case an attorney-client relationship exists and all the rights and responsibilities of such relationship arise. In others, a guardian ad litem may serve as an arm of the court — to investigate, find facts, and make an independent report to the court. The guardian *281 ad litem may serve in a very limited purpose if the court finds such service necessary in the interest of justice. Furthermore, the guardian ad litem’s role at trial may vary depending on the needs of the particular case. The guardian ad litem may, in some cases, participate in the trial by examining witnesses. In some cases, the guardian ad litem may be called to testify, and in others, the role may be more limited.
¶ 48. We find no fault with any of these diverse duties and responsibilities a chancellor might assign to a guardian ad litem in a particular case. However, we encourage chancellors to set forth clearly the reasons an appointment has been made and the role the guardian ad litem is expected to play in the proceedings. To avoid potential problems regarding confidential communications and other expectations, chancellors should make clear: (1) the relationship between the guardian ad litem and the children, incompetent, or other ward of the court; (2) the role the guardian ad litem will play in the trial; and (3) the expectations the trial judge has for the guardian ad litem. The role a chancellor expects a guardian ad litem to play should be set forth clearly in the written order of appointment. Doing so will make the guardian ad litem’s relationships and general responsibilities clear to each of the parties (including those wards old enough to comprehend), the attorneys, the court, and to the guardian ad litem.
¶ 49. Setting out such expectations should not permanently bind the court should needs change as the litigation progresses. Judges may revise these expectation by order as the need arises, so long as the guardian ad litem is not required to breach client confidences or other ethical duties by the change in responsibilities. Chancellors should be free to assign duties to a guardian ad litem as the needs of a particular case dictate, and the role of the guardian ad litem should at all times be clear.
¶ 50. In the present case, the chancellor failed to define clearly the purposes for which a guardian ad litem was appointed. In fact, the record reveals, that at times, the chancellor viewed the guardian ad litem as a special master for the court, and at other times, as an attorney representing the children.
¶ 51. The order initially appointing the guardian ad litem in this matter stated, “the parties are ordered to cooperate fully with the appointed Guardian Ad Litem and to promptly execute and deliver any and all authorizations necessary for the Guardian Ad Litem to communicate with counselors, physicians, forensic professionals and others regarding the minor children.” The only other direction provided to the guardian ad litem was the order naming the guardian ad litem and requiring each parent to deposit six hundred dollars into the registry of the court for his services. There are no further instructions to the parties, their attorneys, the minor children or the guardian ad litem as to the role of the guardian ad litem was to play in this matter.
¶ 52. In the chancellor’s bench opinion and judgment, the chancellor referred to the role of the guardian ad litem by saying, “This Court entered orders. One of them was to appoint ... [a] guardian ad litem for these children. Whenever there are such serious allegations concerning the health, welfare, and well-being of minor children it is incumbent upon this Court to appoint them a lawyer....” (Emphasis supplied) The chancellor also stated, “The Court instructed the attorneys that it was important that these children be allowed access to their lawyer, [the guardian ad litem], and they were being denied access.” Later, the chancellor pointed out *282 that “the guardian ad litem is not just a token in a case like this. He is an active representative of the children. He is charged with seeing to their best interest. He has a duty not only to his clients, the children, but also to the Court to conduct his duty and to make reports to the Court. And [he] has made a diligent effort in fulfilling that role.... ” (Emphasis supplied.)
¶ 53. The court’s multiple references to the guardian ad litem as the children’s attorney are at odds with the reference to the guardian ad litem’s duty to make a report to the court, other than as any other lawyer representing a client might be required to do. If the guardian ad litem was appointed in this matter as an attorney representing the children, he owed the children all of the loyalty, duties, and confidentiality mandated by the attorney-client relationship. In describing those duties, the Mississippi Rules of Professional Conduct include no exception for a guardian ad litem. No rule of ethics allows a guardian ad litem to ignore or violate the attorney-client privilege, or any other aspect of the attorney-client relationship.
[16] ¶ 54. On the other hand, if the guardian ad litem is to act as one who investigates and makes recommendations to the court, that role must be made clear to the parties, and particularly, to the children of suitable age and experience for whom the guardian ad litem is appointed. Such children have a right to be informed whether or not the guardian ad litem is their attorney, and whether a confidential relationship exists. Therefore, prudence requires the guardian ad litem’s role be made clear.
¶ 55. We reiterate for emphasis: When making an appointment, we encourage chancellors to define clearly the role and responsibility of the guardian ad litem. Chancellors should not (as happened in this case) appoint a guardian ad litem to serve in the dual role of advisor to the court and lawyer for the child.
¶ 56. Furthermore, where a guardian ad litem is appointed as an investigator for, or advisor to, the court, the guardian ad litem should recommend a course of action to the court, but the guardian ad litem should never serve as a substitute for the court. The court is not bound by the guardian ad litem’s recommendation, and the court, not the guardian ad litem, is the ultimate finder of fact.[11] See Hensarling v. Hensarling, 824 So.2d 583, 587 (Miss.2002).
¶ 57. Therefore, a guardian ad litem appointed to investigate and report to the court is obligated to investigate the allegations before the court, process the information found, report all material information to the court, and (if requested) make a recommendation. However, the guardian ad litem should make recommendations only after providing the court with all material information which weighs on the issue to be decided by the court, including information which does not support the recommendation. The court must be provided all material information the guardian ad litem reviewed in order to make the recommendation. Recommendations of a guardian ad litem must never substitute for the duty of a chancellor.
¶ 58. In the present case, the guardian ad litem was entitled to his opin *283 ion, but he should have presented at trial the allegations of abuse and both the evidence that substantiated the allegations and the evidence that did not. As previously stated, the trial court, and not the guardian ad litem, is the ultimate finder of fact.
CONCLUSION
¶ 59. The trial court erred in ruling that the grandmother’s notice of appeal was not timely filed pursuant to the Mississippi Rules of Appellate Procedure. Furthermore, the trial court erred in ruling that, under the facts of this case, the grandmother had no right to intervene. We reverse the trial court’s judgment rendered February 10, 2006, and remand for a new trial, with instructions that the grandmother be allowed to intervene as an interested party in the custody dispute.
¶ 60. REVERSED AND REMANDED.
WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY.

. As will be discussed, the mother of the children involved in this case absconded from the jurisdiction, and the chancellor struck her pleadings. Thus, much of the evidence supporting the allegations of sexual abuse was not presented at trial. We gleaned much of the factual background recited herein from transcripts of the numerous motion hearings, the exhibits to motions, and other pleadings.

. See D.C. v. D.C., 988 So.2d 359 (Miss.2008).

. Because of the allegations of sexual abuse, the names of the parties will not be used. The mother and father of the children share the same initials, therefore the parties will be identified in reference to relationship with the children.

. The children’s names have been replaced with Jane and John.

. The record reveals only one attempt to qualify the guardian ad litem to render such expert opinions. The only qualification stated was that the guardian ad litem had served for many years as a guardian ad litem. In other words, the first time the guardian ad litem rendered such an opinion, he was not qualified, but thereafter, he was because he had done so before. We find such meager qualifications unacceptable as a matter of law, under the principles set forth in Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (adopted by this Court in Miss. Transp. Comm'n v. McLemore, 863 So.2d 31, 35-40 (Miss.2003)).

. According to the grandmother's brief, an exchange at a later hearing between her counsel, Karen Spencer, and the chancellor occurred in the trial court's chambers without a court reporter, during which Spencer
begged the court to require that the visitation with [the Father] be supervised. The court told Spencer that the harm had already been done and that [the Father] would not do it again since the spotlight of the world was on him. The chancellor then stated, "Merry Christmas, Ms. Spencer.”
We place no evidentiary value on this alleged discussion because it was not recorded, and is *275 outside the record. We mention it here only to emphasize the importance of recording all proceedings before the court.

. At this point, the chancellor who had heard all previous proceedings was no longer on the bench, and the case was assigned to a new chancellor.

. We pause again to note that — because the mother absconded from the court's jurisdiction — the chancellor struck all of her pleadings, and the trial record was not developed with respect to the alleged abuse.

. Such third parties might include (for instance) the Mississippi Department of Human Services, or a guardian ad litem.

. While not dispositive, we note with interest that the Mississippi Legislature, which is the body charged with determining public policy in Mississippi, enacted Section 93-16-3 of the Mississippi Code, which grants visitation rights to grandparents. For an excellent discussion of the visitation rights of parents and grandparents in Mississippi, see 4 Jeffrey Jackson & Mary Miller, Encyclopedia of Mississippi Law § 28:15 (2001).

. This Court has held "that when a chancellor's ruling is contrary to the recommendation of a statutorily required guardian ad litem, the reasons for not adopting the guardian ad litem’s recommendation shall be stated by the court in the findings of fact and conclusions of law.” S.N.C. at 1082. Our holding today is not contrary to this requirement.